**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 25, 2019**

# In the Court of Appeals of Georgia

A18A1460. PIERSON v. THE STATE.

REESE, Judge.

A jury found Thomas Pierson guilty of two counts of sexual assault of a person in custody, four counts of violation of oath by a public officer, and one count each of false imprisonment and tampering with evidence.[1] He appeals from the judgment on his convictions, arguing that the evidence was insufficient to support his sexual assault and violation of oath convictions. For the reasons set forth, infra, we affirm.

Viewed in the light most favorable to the jury's verdict,[2] the evidence showed the following facts. At approximately 12:15 p.m. on February 14, 2016, a woman, V. C., was driving southbound on Georgia Highway 85 on her way to have lunch with

---

[1] See OCGA §§ 16-6-5.1 (b) (3); 16-10-1; 16-5-41 (a); 16-10-94 (a).

[2] See *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004).

a friend, K. F. V. C. was unfamiliar with the area, so she was on the phone with K. F., who was giving her directions. The Appellant, a deputy with the Harris County Sheriff's Office, drove past V. C.'s car in the opposite direction and observed that she was speeding. The Appellant turned his patrol car around, activated the car's blue lights, and stopped V. C.'s car (hereinafter, "Traffic Stop 1").[3]

After the Appellant obtained V. C.'s driver's license, the two began "flirting" with one another; V. C. admitted at trial that she flirted with the Appellant because she hoped it would help her avoid a speeding ticket. After a few minutes, the Appellant wrote up a warning citation, but did not give it to V. C. at that time. When he told V. C. that he was going to give her a warning instead of a ticket, he said that he had not told her sooner because he wanted to make her "sweat a little bit[.]" As the Appellant and V. C. continued to flirt, V. C. realized that her seatbelt had pulled her shirt down so that the Appellant was able to see down her shirt, and she adjusted her seatbelt to correct the problem. The Appellant responded by telling her that he might have to change the warning citation to a speeding ticket. After flirting with V. C. a bit more, the Appellant suggested that V. C. drive a little way up the highway and

_____

[3] A video recording of Traffic Stop 1, obtained from the Appellant's patrol car dash cam on the day at issue, was admitted into evidence and played for the jury at trial.

2

turn right onto the first side road. The Appellant then ended Traffic Stop 1 by giving V. C. a warning citation for speeding and returning her driver's license.

As V. C. pulled her car back onto the highway to leave, she saw a "big box truck" coming toward her in her lane, and V. C. purposely rushed to pull in front of it so the truck would be between her car and the Appellant's patrol car. As she was driving away, V. C. saw the side road the Appellant had told her to turn onto, but she intentionally drove past it and continued driving south on the highway. Less than five minutes later, the big box truck behind V. C. turned off the highway, and the Appellant's patrol car "rushed up behind [her]." V. C. tried to ensure that she was driving below the speed limit while she again talked on the phone with K. F., getting directions and telling him about Traffic Stop 1. The Appellant pulled up "close behind" V. C.'s car, activated his blue lights, and pulled V. C. over a second time ("Traffic Stop 2").

As soon as he parked his patrol car behind V. C.'s car, the Appellant turned off his dash cam recorder.[4] At trial, the Appellant admitted that he knew that, if the dash

_____

[4] A video recording of Traffic Stop 2 that was obtained from the Appellant's patrol car dash cam confirmed that, as soon as the Appellant parked his patrol car behind V. C.'s car, the dash cam stopped recording, so there was no audio or video recording of what occurred thereafter. The recording was admitted into evidence and played for the jury at trial.

3

cam recorder "continued to film [Traffic Stop 2, the recording] was going to be evidence of whatever took place on that event[.]" As the Appellant walked toward V. C.'s car, V. C. rolled down her window and asked him, "[W]hy the hell did you pull me over this time[?]" The Appellant told her that he was sorry and that he "just wanted to talk to [her]." There was a lot of traffic on the highway during Traffic Stop 2, and the Appellant told V. C. to pull her car forward and turn onto the next side road.[5] The Appellant's patrol car's blue lights were still activated, and V. C. complied because she "thought [she] had to." V. C. turned and stopped her car on the side road, leaving enough room behind her for the Appellant's patrol car to park. The Appellant, however, drove his patrol car alongside V. C.'s car, rolled down his window, and told her to follow him. Although uncertain about what she was supposed to do under these circumstances, V. C. believed she had to obey the Appellant's directions, so she followed the Appellant as he drove down the side road and around a corner. The Appellant then turned and drove down a dirt road and parked, and V. C. became

It is undisputed that the Appellant's act of turning off the dash cam recorder during Traffic Stop 2 constituted a breach of the sheriff's department's policies, and the act was the basis for his tampering with evidence conviction.

[5] The recording of the few seconds that preceded Traffic Stop 2 showed that the Appellant passed some parking lots where he could have safely conducted the stop away from highway traffic.

afraid and nervous about the situation. V. C. did not drive down the dirt road but, instead, stopped her car on the side road and stayed inside with her doors locked. The Appellant walked back to V. C.'s car and told her that he "just want[ed] to talk to [her]," so she rolled her window down. After talking to V. C. for a few minutes, the Appellant suddenly reached through her car window, grabbed her arm, unlocked the car door, pulled the door open, and tried to pull her out of the car. V. C. resisted and tried to stay in her car, but the Appellant told her that he just "wanted to see what [he was] looking at[ ]" and convinced her to walk with him to his patrol car so they could talk.

While the Appellant and V. C. were talking in front of the patrol car, the Appellant suddenly grabbed V. C. and forced her to perform oral sex on him. During the assault, V. C. noticed that the Appellant was wearing blue plaid boxer shorts. And, at some point during the assault, the Appellant received a dispatch call on his police radio directing him to go to another location. The Appellant also "fiddl[ed]" with something on his belt, telling V. C. that he had to make sure that the "recorder" was off. After the assault, as V. C. went back to her car, the Appellant told her not to tell anyone about what had happened.

Despite the warning, V. C. immediately talked to her friend, K. F., on the phone and told him about the assault; she also called two other friends shortly thereafter. At trial, her friends described V. C.'s demeanor during those phone calls as "totally distraught" and "[h]ysterical[,]" and testified that she was crying and difficult to understand. Although her friends told V. C. to call 911 and report the assault, V. C. refused to do so, fearing that the Appellant or one of his friends would respond to the call.

As V. C. was driving home after the assault, she left Harris County and entered Pike County, where she saw the office of the Pike County Sheriff's Office. V. C. decided to stop there and report the assault, because the Appellant did not work for Pike County. She told the Pike County police officers what had happened and showed them the warning ticket the Appellant had given her during Traffic Stop 1. During the interview, V. C. described the boxer shorts the Appellant was wearing during the assault. The officers contacted the Harris County Sheriff's Office, which sent an investigator to the Pike County office to interview V. C.[6] and the Pike County

_____

[6] The Harris County investigator testified at trial, an audio recording of the investigator's interview of V. C. was introduced into evidence, and portions of the interview were played for the jury.

In addition, an agent with the Georgia Bureau of Investigation ("GBI") interviewed V. C. about the assault the next day. The GBI Agent testified at trial, an

6

officers. According to the Harris County investigator, V. C. "appeared shaken [and] emotional" and "looked like she had been crying" when the investigator arrived to interview her. Following the interviews, the investigator called the Harris County Sheriff Mike Jolley and relayed the information she had obtained about the assault.

In the meantime, Sheriff Jolley called Neil Adams, the Chief Deputy of the Harris County Sheriff's Office ("Chief Adams"), who, in turn, advised other department supervisors about the situation and instructed them to meet him at the sheriff's office. When the Appellant returned to the sheriff's office at the end of his shift that day, Chief Adams and the other supervisors met with him and told him about V. C.'s allegations, and the Appellant "adamantly denied" that any sexual encounter had taken place between him and V. C. While speaking with the Appellant, Chief Adams received a phone call from the Harris County investigator who had interviewed V. C., and the investigator reported that V. C. had described the underwear the Appellant was wearing during the assault. When Chief Adams informed the Appellant, the Appellant agreed to show one of the supervisors his underwear, which matched V. C.'s description. At that point, the Appellant started to

audio recording of the agent's interview of V. C. was introduced into evidence, and portions of the interview were played for the jury.

7

cry and said, "it was consensual." Chief Adams ended the interview and placed the Appellant on administrative leave. The Appellant was also required to turn in his "gun belt," and the Appellant admitted at trial that, throughout his encounters with V. C., he had a gun and a taser on his belt.[7] The supervisors also manually downloaded the recordings from the Appellant's patrol car's dash cam and watched the recordings of Traffic Stops 1 and 2.

The next morning, the Appellant met with Sheriff Jolley and Chief Adams and apologized for embarrassing the sheriff's office. The Appellant gave them a two-page, unsigned, unsworn, typed statement in which he admitted that V. C. had performed oral sex on him the previous day, but he claimed that it was consensual and was initiated by V. C.[8] Given that the sexual contact described by the Appellant

---

[7] The evidence showed that, at the time at issue, deputies with the Harris County Sheriff's Office typically carried a Glock .40 caliber pistol with extra ammunition, a taser, and two sets of handcuffs on their gun belt.

[8] During his testimony, Sheriff Jolley read the statement to the jury. In addition, during the State's cross-examination of the Appellant at trial, the prosecutor read the statement the Appellant had written, line-by-line, and compared the statement and the Appellant's direct testimony to the dash cam recordings of the traffic stops, pointing out the numerous inconsistencies between the recordings and the Appellant's versions of the events.

constituted a "serious violation" of the policies of the sheriff's office, Sheriff Jolley terminated the Appellant's employment.

As part of the office's investigation, Sheriff Jolley had his staff audit all of the traffic stops the Appellant had conducted in the previous six months in order to find out if other people had been involved in similar incidents with the Appellant. The department sent letters to all of the people the Appellant had stopped during that time period. In response to the letter, a woman, L. F., contacted the department and reported that the Appellant had stopped her car on October 19, 2015, and then detained her for 45 minutes.[9] About 18 minutes after the stop began, the Appellant turned off the body microphone he was wearing, and, about 11 minutes after that, the Appellant turned off his patrol car's dash cam recorder.[10] L. F. testified that, during the stop, the Appellant leaned into her car window while talking with her and, as she showed him some pictures on her phone, he grabbed the phone. The Appellant then showed L. F. a video on his own phone showing the Appellant having sex with a woman; the Appellant told L. F. that the woman was someone he "sleeps with" and

---

[9] According to Sheriff Jolley, the "typical length of a traffic stop" is four to five minutes.

[10] A dash cam recording of the first 29 minutes of the traffic stop was admitted at trial and played for the jury.

9

was not his wife. Although L. F. had become frightened by this point in the traffic stop, she did not believe she was free to leave until the Appellant released her.

The next afternoon, the Appellant went to L. F.'s home and knocked on her door; L. F. testified that she had not invited the Appellant to her home. L. F. peeked out the window, saw the Appellant, and did not answer the door because she was scared. The Appellant left L. F.'s home, but returned about an hour later and, when he again knocked on the door, L. F. did not answer it because she was "freaked out" by the fact that the Appellant had returned. Instead of leaving immediately when L. F. did not answer the door, the Appellant stood behind his patrol car, which was parked in her driveway, and waited a while before leaving.[11]

After the media published a story about the Appellant's assault of V. C., the GBI Agent who was investigating the incident contacted and interviewed a woman, C. T., who had posted an entry on Facebook describing a traffic stop conducted by a Harris County deputy.[12] At trial, C. T. testified that, on September 12, 2015, the

---

[11] L. F. took photographs of the Appellant standing behind his patrol car, and the photographs were admitted at trial and published to the jury.

[12] An audio recording of the interview was admitted at trial, and portions of it were played for the jury.

Appellant stopped her car as she was driving through Harris County.[13] The traffic stop lasted about 26 minutes, during which the Appellant and C. T. talked and flirted with one another. Even though the Appellant handed C. T. a warning citation[14] about 22 minutes into the stop, the Appellant continued to talk to C. T., and she did not feel free to leave. The Appellant did not end the traffic stop and return to his patrol car until C. T. told the Appellant that she was in a hurry because she was going to see her grandmother, noting that her grandmother lived "off of Holland Road."

C. T. went home briefly, then, as she was driving to her grandmother's home, she saw the Appellant's patrol car coming toward her on Holland Road. After passing C. T., the Appellant turned his patrol car around and followed C. T.'s car until she pulled into her grandmother's driveway. The Appellant parked at the end of the driveway and stayed there for about ten minutes. According to C. T., she felt "[e]xtremely uncomfortable[,]" "flustered," "upset[,]" and "fearful" because the Appellant had used information he had obtained during a traffic stop to find her.

---

[13] A dash cam recording of the traffic stop was admitted at trial and played for the jury.

[14] Notably, at the bottom of C. T.'s warning citation, the Appellant wrote, "Slow your ass down!"

11

Following the Appellant's arrest and indictment for offenses committed against the three victims, the case proceeded to trial, where a jury found the Appellant guilty on two counts of sexual assault on a person in custody, based upon his improper sexual contact with V. C.; four counts of violation of oath by a public officer, based on his improper conduct during the traffic stops; one count of false imprisonment of V. C.; and one count of tampering with evidence, based upon his act of shutting off the dash cam recorder during Traffic Stop 2.[15] The trial court sentenced the Appellant to twelve years imprisonment, with eight to serve, plus a consecutive sentence of five years on probation for one of the violation of oath convictions. This appeal followed.

On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict and an appellant no longer enjoys the presumption of innocence. This Court determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*,[16] and does not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support

---

[15] The jury found the Appellant not guilty on charges of committing acts of aggravated sodomy and sexual battery against V. C.; stalking L. F.; and stalking C. T.

[16] 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

12

each fact necessary to make out the State's case, we must uphold the jury's verdict.[17]

"The standard of *Jackson v. Virginia*[18] is met if the evidence is sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crime charged."[19] With these guiding principles in mind, we turn now to the Appellant's specific claims of error.

1. The Appellant contends that the evidence was insufficient to support his convictions for sexual assault on a person in custody, arguing that the evidence showed that V. C. was not being "detained" by him or "in [his] custody" at the time of the sexual assault. We disagree.

OCGA § 16-6-5.1 (b) (3) provides that

[a] person who has supervisory or disciplinary authority over another individual commits sexual assault when that person[ is] an employee or agent of a law enforcement agency and engages in sexual contact with such other individual who the actor knew or should have known is being detained by or is in the custody of any law enforcement agency[.]

---

[17] *Walker v. State*, 329 Ga. App. 369, 370 (765 SE2d 599) (2014) (punctuation and other footnote omitted).

[18] 443 U. S. at 319 (III) (B).

[19] See *Bautista v. State*, 305 Ga. App. 210, 211 (1) (699 SE2d 392) (2010).

As the trial court instructed the jury at the end of the trial, for the purpose of this statute, "[c]ustody means the state of being kept or guarded, and the state of being detained or held under guard, especially by the police. Custody presupposes actual imprisonment or detention by law enforcement such that the person is not free to go about his or her normal activities."[20]

(a) As an initial matter, OCGA § 16-6-5.1 (e) specifically provides that "[c]onsent of the victim shall not be a defense to a prosecution under this Code section." Thus, although the Appellant insisted before and during trial that V. C. had consented to the sexual conduct at issue,[21] he could not rely on her alleged consent

---

[20] See *Palmer v. State*, 260 Ga. 330, 331 (393 SE2d 251) (1990) (The Supreme Court ruled that the term "custody," as used in OCGA § 16-6-5.1, was similar in context to how the term is used to determine if a person has escaped, and "presupposes actual imprisonment or detention.") (citation omitted); *Krause v. State*, 263 Ga. App. 488, 489-490 (2) (588 SE2d 239) (2003) (The trial court instructed the jury that the word "'custody'" meant being in a state of "'being kept or guarded or the state of being detained or held under guard.'" This Court ruled that there was nothing vague about the definition and that it was sufficient for the jury to understand what it meant to be in custody.).

Notably, the trial court's jury instruction incorporated all of the language requested by the Appellant and was consistent with defense counsel's closing arguments to the jury. Further, the jurors had a copy of the court's instruction on custody with them during their deliberations.

[21] In contrast, V. C. repeatedly denied that she had consented to performing oral sex on the Appellant, testifying that she only did so because he had forced her.

14

as a defense to the charges at issue in this case, i.e., that he violated OCGA § 16-6-5.1 (b) (3) by sexually assaulting V. C. while she was detained by him or in his custody.[22]

(b) In arguing that the evidence was insufficient to support his convictions under OCGA § 16-6-5.1 (b) (3), the Appellant contends that the State failed to prove that he "knew or should have known" that he was detaining V. C. or had her in his custody at the time of the sexual conduct. In his brief, the Appellant admits that Traffic Stop 2 began as a "detention" of V. C. because he had used his blue lights to pull her over, but he claims that, shortly after he conducted the stop, he told V. C. that he "just wanted to talk to her."[23] The Appellant argues that, because he stopped V. C. for his own "personal reasons[,]" and not because she had violated the law, he "was aware that [V. C.] was not being officially detained and was free to leave." He also contends that the evidence established that he turned off his blue lights when he turned onto the side road, that V. C. "willingly" followed him down the road, and that

---

[22] Instead, V. C.'s alleged consent was only a defense to the charges that the Appellant committed aggravated sodomy and sexual battery. Notably, the jury found the Appellant not guilty on those charges.

[23] Although the Appellant claims that, at some point during Traffic Stop 2, he told V. C. that she was "no longer being officially detained[,]" he has not cited to evidence in the record to support that assertion, and we have found nothing in the trial transcript or the exhibits to support it.

15

he did not park his patrol car in a manner that prevented her from driving away. The Appellant argues that, as a result, the evidence was "clear" that V. C. was not being detained by him or in his custody at the time of the sexual conduct, as required by the statute, so his convictions must be reversed. These arguments lack merit.

The undisputed evidence at trial showed that, on the day of the assault, the Appellant was driving a Harris County Sheriff's Office patrol car; was on duty during his assigned shift; was wearing his official uniform, which was equipped with a microphone; and had a pistol, taser, and police radio attached to his belt. After the Appellant parked his patrol car on the dirt road, he walked back to V. C.'s car and convinced her to walk with him to the front of his patrol car. In addition, it is undisputed that, while the Appellant and V. C. were engaged in sexual conduct, he received a dispatch call on his police radio, which supported a finding that he was on official duty at the time of the assault.

The Appellant also admitted at trial that, when he turned on his blue lights to conduct Traffic Stop 2, V. C. was obligated to pull over and stop her car.[24] The

---

[24] See OCGA §§ 16-10-24 (a) ("[A] person who knowingly and willfully obstructs or hinders any law enforcement officer[ ] in the lawful discharge of his or her official duties shall be guilty of a misdemeanor."); 40-6-395 (a) ("It shall be unlawful for any driver of a vehicle willfully to fail or refuse to bring his or her vehicle to a stop or otherwise to flee or attempt to elude a pursuing police vehicle or

16

Appellant testified that, at the time, he knew the stop was an "unlawful detention" of V. C., because he had no legal reason to stop her, and that conducting the unauthorized stop violated his oath of office.

Further, V. C. testified that, under the circumstances, she did not think she was allowed to leave after the Appellant stopped her the second time or that she could refuse to do what the Appellant instructed her to do, and she believed that she was required to follow his patrol car down the side road, because he had activated his blue lights and had told her to follow him.[25] In fact, V. C. testified that the Appellant's conduct toward her was the *only* reason she followed his patrol car down the side road. She also testified that, after the Appellant parked on the dirt road, she did not want to get out of her car because she was afraid and nervous. According to V. C.,

---

police officer when given a visual or an audible signal to bring the vehicle to a stop."); see also *Smith v. State*, 290 Ga. 768, 774 (3) (723 SE2d 915) (2012) ("[I]t is the act of fleeing from an individual police vehicle or police officer after being given a proper visual or audible signal to stop from that individual police vehicle or officer[ ] that forms the proper 'unit of prosecution' under OCGA § 40-6-395.") (citations omitted).

[25] See *Lebis v. State*, 302 Ga. 750, 761-762 (III) (B), (C) (808 SE2d 724) (2017) (The defendant's intentional failure to comply with officers' directions constituted obstruction.)

however, the Appellant walked up to her car, grabbed her arm, and tried to pull her out of her car, then held onto her wrist as he walked her to the front of his patrol car.

Based on this evidence, we conclude that the jury was authorized to find that V. C. was being detained by the Appellant or kept in his custody to the extent that she was not free to go about her normal activities.[26]

Moreover, during trial, the Appellant made the same arguments to the jury that he now makes on appeal, i.e., that V. C. was not credible, her version of her encounter with the Appellant was a complete lie, and the evidence demanded a finding that he was not detaining V. C. and did not have her in custody at the time of the sexual

---

[26] See *Krause*, 263 Ga. App. at 488-489 (1) (After a police officer responded to a 911 domestic violence call, he threatened to arrest the victim if she did not have sex with him. He then took her to a motel and had sex with her. At trial, the victim testified that, even though the officer left her alone in the patrol car while he went inside the motel office and rented a room, she was afraid to leave because he was a police officer, he had a gun on his belt, and she was under his authority, explaining that "'you don't just leave[ ]'" under these circumstances. This Court found that the evidence was sufficient to support the officer's conviction for sexually assaulting a person in custody.); cf. *Palmer*, 260 Ga. at 330-331 (The Supreme Court held that the victim, who was on probation and was being monitored by the defendant, her probation officer, was free to go about her normal activities while on probation and, thus, was not "in the custody of the law," as was required by the version of OCGA § 16-6-5.1 that was in effect at that time. The Court also noted that the victim's probation order stated that the victim could be taken into custody if she violated the conditions of her probation and, thus, specifically distinguished between her being in "custody" versus on "probation.").

conduct.[27] The issue of the Appellant's intent during the crime, however, was solely for the jurors to decide after considering the credibility of the witnesses and resolving the conflicts in the evidence.[28] Based upon the jury's guilty verdicts, the jurors

[27] We note that, to the extent the Appellant relies on *Jowers v. State*, 225 Ga. App. 809, 811 (2) (484 SE2d 803) (1997), for his argument that the evidence compelled a finding that V. C. was not in his custody at the time of the assault, such reliance is misplaced. In *Jowers*, the trial court granted a directed verdict on the charge that the defendant had sexually assaulted a person in custody based upon its conclusion that the evidence presented was insufficient to support a finding by the jury, beyond a reasonable doubt, that the victim was in the defendant's custody at the time of the assault. Id. at 810. Because, under OCGA § 5-7-1 (a), the State was precluded from appealing that ruling, it was not subject to appellate review by this Court. See *State v. Seignious*, 197 Ga. App. 766, 767 (399 SE2d 559) (1990) ("A directed verdict of acquittal is not appealable by the State when the defendant has been put in jeopardy.") (citation and punctuation omitted). Consequently, because this Court's opinion in *Jowers* did not consider the propriety of the trial court's directed verdict on the custody issue, *Jowers* does not constitute precedent for the ruling upon which the Appellant relies. See *State v. Walker*, 295 Ga. 888, 893 (764 SE2d 804) (2014) (Appellate court decisions "stand only for the points raised by the parties and decided by the court. Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (citation and punctuation omitted).

[28] See *Cuzzort v. State*, 307 Ga. App. 52, 54 (1) (703 SE2d 713) (2010) ("[I]ntent is a question for the jury, which is authorized to consider all other circumstances connected with the act at issue as well as the defendant's words, conduct and demeanor.") (citation and punctuation omitted).

19

obviously found that the Appellant was not credible and rejected his version of the events, as the jurors were authorized to do.[29]

Thus, after viewing the evidence in the light most favorable to the jury's verdict,[30] we conclude that there was sufficient evidence for the jury to find, beyond a reasonable doubt, that the Appellant was guilty of sexually assaulting a person in custody.[31] Those convictions are affirmed.

2. The Appellant contends that the evidence was insufficient to support his convictions for violation of oath by a public officer, arguing that the evidence failed to show that he had taken an oath "as prescribed by law," as required by OCGA § 16-10-1. We disagree.

OCGA § 16-10-1 provides that "[a]ny public officer who willfully and intentionally violates the terms of his oath *as prescribed by law* shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than

---

[29] See *Bray v. State*, 294 Ga. App. 562, 563 (1) (669 SE2d 509) (2008) ("A jury is authorized to believe or disbelieve all or any part of the testimony of witnesses, and it serves as the arbiter of conflicts in the evidence before it.") (citation and punctuation omitted).

[30] See *Rankin*, 278 Ga. at 705.

[31] See *Krause*, 263 Ga. App. at 488-489 (1).

20

five years."[32] "[T]o prove a violation of this Code section, the State must present evidence that the defendant violated the terms of the oath actually administered and that those terms were from an oath 'prescribed by law,' that is, one that the legislature required of a public officer before entering the duties of his or her office."[33]

(a) OCGA § 45-3-7, entitled "Oaths of deputies," provides as follows:

> Before proceeding to act, all deputies shall take the same oaths as their principals take and the oaths shall be filed and entered on the minutes of the same office with the same endorsement thereon; but this Code section shall not apply to any deputy who may be employed in particular cases only. *A deputy sheriff may take his oaths before the sheriff and the oaths may be filed in and entered in the records of the sheriff's office.*[34]

At trial, Sheriff Jolley testified that, before the Appellant or any other deputy sheriff in the Harris County Sheriff's Office was allowed to take any actions in his or her official capacity, he or she was administered the "Official Oath of a Deputy

---

[32] (Emphasis supplied.)

[33] *Bradley v. State*, 292 Ga. App. 737, 740 (2) (665 SE2d 428) (2008) (citation and punctuation omitted).

[34] (Emphasis supplied.)

Sheriff" ("the oath").[35] The State introduced into evidence a copy of the oath the

Appellant had taken, and Sheriff Jolley read the oath to the jury, as follows:

> I, Thomas Pierson,[36] do swear that I will faithfully execute all writs,
> warrants, precepts, and processes directed to me as deputy sheriff of this
> county, or which are directed to all sheriffs of this State, or to any other
> sheriff specially, I can lawfully execute, and true returns make, and in
> all things well and truly, without malice or partiality, perform the duties
> of the Office of Deputy Sheriff of Harris County, during my continuance
> therein.
>
> I do further solemnly swear or affirm that I am not the holder of any
> public money due this State unaccounted for, that I am not the holder of
> any office of trust under the Government of the United States (except
> postmaster), nor of either of the several states, nor of any foreign state,
> and that I am other wise qualified to hold said office, according to the
> Constitution of the United States and laws of Georgia, and that I will
> support the Constitutions of the United States and of this State.
>
> SO HELP ME GOD!

---

[35] See OCGA § 45-3-8 ("No officer or deputy required by law to take and file the oaths prescribed in Code Section 45-3-1 shall enter upon the duties of his office without first taking and filing the same in the proper office.").

[36] The Appellant's name was hand-written on the copy of the oath.

The first paragraph of the oath is almost identical to the oath that sheriffs are required to take, pursuant to OCGA § 15-16-4.[37] Thus, the oath fulfilled the requirement, under OCGA § 45-3-7, that the Appellant "take the same oath[ ] as [his] principal[,]" i.e., the sheriff.[38] Further, Sheriff Jolley testified that he personally administered the oath to the Appellant, that the Appellant swore the oath, and that a copy of the oath, with the Appellant's name hand-written at the top, was filed in the sheriff's department, as required by OCGA § 45-3-7.

---

[37] See OCGA § 15-16-4 ("Before entering on the duties of their office the sheriffs shall take and subscribe, in addition to the oath required of all civil officers, the following oath before the judge of the superior court or the judge of the probate court: 'I do swear that I will faithfully execute all writs, warrants, precepts, and processes directed to me as sheriff of this county, or which are directed to all sheriffs of this state, or to any other sheriff specially, which I can lawfully execute, and true returns make, and in all things well and truly, without malice or partiality, perform the duties of the office of sheriff of _____ County, during my continuance therein, and take only my lawful fees. So help me God.'").

[38] See *Jowers*, 225 Ga. App. at 811 (2) (The "terms" of the oath that the legislature "prescribed by law" for deputy sheriffs in OCGA § 45-3-7, are the same "terms" of the oath that the legislature "prescribed by law" for sheriffs in OCGA § 15-16-4.).

Under these circumstances, we find that there was sufficient evidence to show that the terms of the oath taken by the Appellant were "prescribed by law," as required by OCGA § 16-10-1.[39]

(b) The Appellant argues, however, that, even if the sheriff had administered the oath to him at some point prior to the improper conduct at issue, the oath was invalid because it was not "subscribed" by him, as required by OCGA § 45-3-3, which provides that,

> *[w]hen not otherwise provided by law . . .* , the oaths of office may be taken before any officer authorized by law to administer an oath. Such oaths shall be written and *subscribed by the persons taking them* and

---

[39] See *Bradley*, 292 Ga. App. at 741 (2); *Jowers*, 225 Ga. App. at 811 (2); see also *Dimauro v. State*, 341 Ga. App. 710, 720 (3) (b) (801 SE2d 558) (2017) (In proving that the defendant violated his oath of office, the State presented an instructor with the defendant's police department, who testified that the defendant had been administered the oath of office that was required by law.); *Greene v. State*, 257 Ga. App. 837, 838-839 (2) (572 SE2d 382) (2002) (This Court affirmed the defendant's conviction for violation of oath by a public officer, even though the State did not produce a copy of the oath that had been signed by the defendant, because the State produced a copy of the oath that was signed by another officer, who testified that, when he took the oath, the defendant was also present and took the same oath. In addition, the defendant's training officer testified that he would not have issued equipment to the defendant if the defendant had not been sworn in. This Court concluded that the evidence presented was sufficient for a jury to find that the defendant took an oath that contained the same terms as averred in the indictment.).

24

accompanied by the certificate of such officer, which shall specify the day and year taken.[40]

The Appellant argues that, absent a showing that he "subscribed" to the oath, the State failed to show that he took the oath "as prescribed by law[,]" as required to constitute a violation of his oath of office under OCGA § 16-10-1. This argument lacks merit.

Pretermitting whether OCGA § 45-3-3 applies in this case, given that its requirements only apply when there is no other law with conflicting requirements, the statute dictates the *manner* in which an oath may be taken and how the administration of the oath is to be officially recorded, not the terms of the oath itself.

In contrast, a plain reading of OCGA § 16-10-1 shows that the phrase "the terms of [the] oath as prescribed by law" refers specifically to the *terms* of the oath itself, not the manner in which the oath had to be administered or memorialized.[41] And, as we found in subdivision (a), supra, the State proved that the terms of the oath

---

[40] (Emphasis supplied.)

[41] See *Jowers*, 225 Ga. App. at 811 (2) (This Court held that OCGA § 16-10-1 was "plain, unambiguous, and on its face does not lead to any absurd or impracticable consequences; such a statute is simply construed by the court according to its terms and no further inquiry as to its interpretation is conducted.") (citations omitted).

taken by the Appellant were "the terms of [the] oath as prescribed by law," i.e., the terms required and codified by the Georgia Legislature for deputy sheriffs in OCGA §§ 15-16-4 and 45-3-7.[42]

It follows that this argument presents no reversible error.

(c) Finally, we conclude that the State presented sufficient evidence to prove that the Appellant's improper conduct violated the terms of his oath.[43]

In four separate counts, the indictment charged the Appellant with violating OCGA § 16-10-1, alleging that he, "being a public officer with Harris County Sheriff's Office, did willfully and intentionally violate the terms of his oath as prescribed by law in that he did swear to 'in all things well and truly, without malice or partiality, perform the duties of the Office of Deputy Sheriff of Harris County[.]'"

---

[42] See id.; see also *Bradley*, 292 Ga. App. at 740-741 (2) (In affirming the defendant's conviction for violating the oath of a public officer, this Court ruled that the State had proven that the oath taken by the defendant, a prison correctional officer, contained the same terms as those the Georgia Legislature "prescribed by law[ ]" for such officers in OCGA § 42-5-31.).

[43] See *Bradley*, 292 Ga. App. at 740 (2).

Each count then specifically described the Appellant's improper conduct that violated his oath of office.[44]

As shown in subdivision (a), supra, the oath required that the Appellant "well and truly, without malice or partiality, perform the duties of the Office of Deputy Sheriff of Harris County[.]" At trial, the State presented the sheriff's office's policy manuals that outlined the required conduct and duties of the office's employees, including deputies, as well as evidence showing that the Appellant was "familiar with [the] policies and procedures and was given a copy of the policy," and that sections of the policy had been reviewed daily during the Appellant's eight-week training period.

According to Sheriff Jolley, the Appellant violated the office's policies, and, thus, his oath, when the Appellant had sexual contact with V. C. during Traffic Stop 2, and when the Appellant engaged in sexually inappropriate conduct with L. F. and

---

[44] Specifically, Count 7 alleged that the Appellant "unlawfully detain[ed] [V. C.]"; Count 8 alleged that he "engage[d] in sexual contact with [V. C.]"; Count 10 alleged that he "engage[d] in sexually-inappropriate behavior during a traffic stop of [L. F.] and did then appear at the residence of said person a day after conducting said traffic stop"; and Count 12 alleged that he "engage[d] in sexually-inappropriate behavior during a traffic stop of [C. T.] and did then appear at the residence of [C. T.'s grandmother] after [C. T.] advised during said traffic stop that she was going to her grandmother's house[.]"

27

C. T. during their traffic stops. Further, the Appellant admitted during his testimony that he failed to "well and truly perform[ his] duties as a deputy sheriff[,]" as required by his oath, when he used sexually inappropriate language and propositioned V. C. during Traffic Stop 1; when he conducted Traffic Stop 2 with no legal reason to stop or detain V. C.; when he engaged in sexual conduct with V. C.; when he engaged in sexually inappropriate behavior with L. F. and C. T.; and when he turned off his body microphone and dash cam recorder during the traffic stops.[45] In fact, during closing arguments, the Appellant's defense counsel challenged only the *validity* of the oath taken by the Appellant, while admitting that the Appellant "clearly . . . violate[d] the terms of his oath, . . . no one's disputing that one bit."

This evidence was sufficient to support the jury's finding that the Appellant was guilty beyond a reasonable doubt of violating OCGA § 16-10-1, as charged in the indictment.[46]

---

[45] The Appellant also testified that he was "ashamed" of his actions; he described his actions as "unprofessional[,]" and "disgusting[ ]"; and he admitted that he had betrayed the sheriff's department, his family, and the citizens of Harris County.

[46] See *Reynolds v. State*, 334 Ga. App. 496, 497, 498-501 (1) (779 SE2d 712) (2015) (The defendant, a police officer, took an oath in which he swore that he would "faithfully perform" his duties and "faithfully observe all the rules, orders, and regulations" of the police department. The chief instructor of the police academy

28

*Judgment affirmed. Barnes, P. J., and McMillian, J., concur.*

---

where the defendant was trained, and who administered the oath to the defendant, testified that the defendant's conduct violated the department's rules, orders, and regulations, and the defendant admitted that the conduct of which he was accused constituted a violation of his oath of office. This Court ruled that the evidence was sufficient to sustain his conviction for violating OCGA § 16-10-1.) (punctuation omitted); *Bradley*, 292 Ga. App. at 740 (2) (The evidence was sufficient where the prison warden testified that bringing cocaine into the prison violated the terms of the oath of office taken by the defendant, a prison correctional officer.).